Filed 11/4/25  P. v. Graves CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B335691 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA097218) |
| v. | |
| ALEX DEMETRIUS GRAVES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Alex Demetrius Graves (defendant) appeals from the denial of his petition for vacatur and resentencing pursuant to Penal Code[1] section 1170.95 (now section 1172.6), after an evidentiary hearing. Defendant contends the superior court erred in denying his petition as to two counts of attempted murder because there was insufficient evidence that he had the requisite intent to kill the "unintended victims." We disagree and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND[2]**
**Procedural background at trial**

In a seven-count information, defendant and codefendants Maurice Bennett and Robert Maxwell were charged in count 1 with the murder of Kyutza Herrera, in violation of Penal Code section 187, subdivision (a). In counts 2 through 5, defendant, Bennett, and Maxwell were charged with the willful, deliberate, and premeditated attempted murder of Carlos Avila, Timothy Ledford, Ronald Davis, and Marcello Martinez, in violation of sections 187, subdivision (a) and 664. Defendant was charged in count 6 with the discharge of a firearm in a grossly negligent manner, in violation of section 246.3, subdivision (a). In count 7, defendant and Bennett were charged with carrying a concealed

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] Because the trial court used the trial record in rendering its decision, we adopt, with minor deletions, the facts relating to defendant's trial from the statement of facts in our nonpublished opinion affirming defendant's conviction in *People v. Graves* (Aug. 30, 2012, B227100).

firearm in a vehicle, in violation of former section 12025, subdivision (a)(1).

As to all counts, the information specially alleged pursuant to section 186.22, subdivision (b)(1), that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members. The information specially alleged as to counts 1 through 5, for purposes of section 12022.53, subdivisions (b), (c), (d), and (e)(1), that a principal personally used and intentionally discharged a handgun.

Defendant was tried jointly with Bennett and Maxwell. Defendant shared one jury with Bennett while Maxwell had another separate jury. Defendant was found guilty of count 1, but as the jury could not reach agreement as to the degree of the murder, it was deemed to be of the second degree. The jury found defendant guilty as charged in the remaining counts and found true all special allegations.

On August 13, 2010, the trial court sentenced defendant to a total prison term of 168 years to life plus two years eight months.

**Evidence at trial**

### *Ace Liquor Store shooting*

On the evening of August 4, 2007, Avila parked in front of the Ace Liquor Store on Long Beach Boulevard in Lynwood to buy snacks for Herrera, his girlfriend and passenger. Ace Liquor Store was located in a neighborhood claimed by the Palm and Oaks Crip gang, a rival of the MOB Piru gang. Members of the Palm and Oaks Crip gang typically wore blue-colored clothing.

Davis and Ledford were also at Ace Liquor Store that evening with their friends Bobby Patrick and Gregory Smith, who entered the store while Davis and Ledford waited outside. Ledford was wearing a blue shirt. After Avila and Herrera returned to Avila's car, there came the sound of squealing tires and gunshots. Davis testified he heard 22 to 45 gunshots in all and saw muzzle flashes coming from the front passenger seat of a white Camaro moving south on Long Beach Boulevard. Davis and Ledford ran into the store to the sound of flying bullets and breaking glass.

Kassandra A., a minor, testified that she was across the street from the liquor store when she heard gunshots and breaking glass and saw two men run into the store as a Mustang slowly moved south on Long Beach Boulevard. She saw bullets strike the car parked in front of the store. It appeared to her that the gunshots came from the Mustang, which sped up after the shooting stopped. Jessie Reyes was also across the street from the liquor store at the time of the shooting. He reported hearing multiple gunshots and then saw a white Camaro and a gray Mustang moving southbound on Long Beach Boulevard.

When the gunfire ended, it was discovered that Davis had been shot in the foot and Ledford had suffered a grazing wound to his hip. Herrera had been shot in the neck and died from the wound a few days later. Bullet holes were later found in Martinez's car, which was parked in front of the liquor store.

There was a total of 16 surveillance cameras from inside and outside the liquor store and the nearby gas station. Investigators viewed the footage and portions were played for the jury showing a gray or silver Mustang and a white Camaro pass

4

in front of the liquor store.  Davis and Ledford can be seen running into the store as gunfire erupts.

Los Angeles County Sheriff's Department (LASD) deputies found multiple .30-caliber carbine (rifle) casings, as well as .40-caliber casings, scattered along Long Beach Boulevard and the front of the liquor store.

### *Related shootings*

On August 21, 2007, Earnest Grayson was shot multiple times on Carlin Avenue in Lynwood, a few blocks from Ace Liquor Store in an area also claimed by the Palm and Oaks gang. Alejandra Guerrero saw a gray or silver Mustang traveling east on Carlin Avenue with a second car following it shortly after the shooting.  Eight .40-caliber casings were found and collected from the crime scene.

On August 24, 2007, Edward Lair, wearing a blue shirt and a Dodger baseball cap, was with his friend Mac Richardson at Tommy's Mechanic Shop on Rosecrans Avenue in Compton, waiting for a battery charge, when he heard multiple gunshots. When the shooting stopped, Lair realized he had been hit by 13 bullets in both arms, a leg, and his abdomen.  Richardson had been shot four times.  Lair did not see the shooter, but Rosalie Bardwell observed the shooting and saw two cars accelerating to a high speed away from the scene.  One car was following the other so closely that she thought the occupants were shooting at each other.  One was a white Mustang and the other was a dark blue Honda.  Ten .40-caliber casings were found on the ground near Rosecrans Avenue.

On October 31, 2007, Heriberto Norori was shot in the abdomen outside the Gaucho Grill restaurant on Beverly Boulevard in Los Angeles.  A black SUV approached the

5

restaurant, and Norori saw an African-American man step out and fire what appeared to be a semiautomatic handgun. Los Angeles Police Department (LAPD) officers arrived shortly after the shooting, and within minutes, they heard more gunshots. In the direction from where the noise came, a gray Mustang and a black SUV were seen speeding away. Officers pursued and stopped the SUV and the Mustang.

The SUV's occupants were identified as Warren Phillipus and Andrew Haley. Haley's address on Killen Court in Compton was later determined to be defendant's address, as well. The officers searched the SUV and found a .380-caliber semiautomatic handgun on the floorboard behind the driver's seat.

When other officers stopped the Mustang, which was later determined to belong to defendant, codefendant Bennett was in the driver's seat and defendant was the front passenger. A search of the car yielded an empty Springfield semiautomatic .40-caliber handgun behind the back seat. The handgun was later determined to be the same weapon that was used to kill Herrera.

### Ballistics evidence

Firearms expert, retired LASD Deputy Dale Falicon, determined that the handgun recovered from defendant's car after the Gaucho Grill shooting was the same .40-caliber weapon that was used to shoot Herrera. He also examined the .40-caliber shell casings recovered from the area of the Gaucho Grill, and those recovered from the Grayson shooting, and determined that they too had been fired from the murder weapon. Deputy Falicon also concluded that the .30-caliber, M-1 carbine rifle seized from defendant's post office coworker, Sergio Moran, had fired seven of

6

the .30-caliber cartridge cases found at the Ace Liquor Store shooting.

### *Visual and wiretap surveillance*

Detective Brown suspected that members of the MOB Piru gang had committed the liquor store shooting, in the territory claimed by their rivals, the Palm and Oaks gang. After searching the MOB Piru neighborhood he found a 1984 white Camaro parked on Palm Avenue. He further identified the driver as codefendant Maxwell and observed the Camaro as it was approached by several young African-American men dressed in gang attire.

In March and April 2008 after Detective Brown had arranged for the California Department of Justice (DOJ) to conduct visual and wiretap surveillance, he produced and distributed a flier with the hope of stimulating telephone conversations about the shooting. The flier contained photographs of Herrera, a Mustang, and a Camaro. The fliers were passed out in the suspects' neighborhood, and one was left at defendant's Killen Court residence. Detective Brown also made a short video clip of the shooting, which was aired during several newscasts.

During visual surveillance outside the Killen Court residence, DOJ agents saw defendant driving the silver Mustang and saw him associating with Haley, Phillipus, and others. On March 20, 2008, agents observed defendant as he appeared to purchase a .40-caliber handgun from the occupants of a dark-colored Honda parked near defendant's Mustang outside his residence.

7

Agents conducted wire surveillance of four "target" telephone numbers, including one belonging to defendant. The conversations were recorded and portions played for the jury.

In March 2008, defendant spoke to his coworker, Moran. Moran inquired about "the gun," and they discussed a price. Moran said he would get the money and pick it up. A few days later, Moran telephoned to tell defendant he was going to take the gun to the Azusa Canyon shooting range the following day.

LASD personnel notified the Azusa City Police Department, which sent officers to the shooting range to wait for Moran. The officers detained Moran and seized the rifle, an M-1 .30-caliber carbine. After it was confiscated, a deputy sheriff telephoned Moran to determine where he had obtained the rifle. In turn, Moran telephoned defendant who told Moran not to tell the police Moran had obtained the gun from him.

In late April 2008, agents recorded conversations between defendant and his girlfriend Markia Tyree. Tyree testified regarding those conversations. She confirmed defendant was upset about some fliers in which his car appeared. He told Tyree he had to get a new car "quick," but he would not tell her the reason over the telephone. Later, defendant twice telephoned Tyree from a car dealership and told her he had to "get rid" of his car.

Tyree testified defendant was very upset about the fliers and told her "they had done something." He said he had to get rid of his car because of what happened, and someone had bad aim and an innocent person had been hit. Because Tyree worked for the Manhattan Beach Police Department, defendant asked her to run his license plate number through the police database. She searched but found nothing recent.

Defendant's telephone conversations with others were also played for the jury with gang expert Detective Richard Sanchez translating some of the gang jargon used in the conversations. "Blood" meant a member of the Blood gang. In one conversation, Haley referred to defendant as "Blood" and to himself as a "P homie," meaning they were both members of the MOB Piru gang, a Blood gang. Haley said he was going to dress in red and black, which were the colors of the MOB Piru gang. Defendant's statement, "I'm going to pop if you don't put that on Piru," meant that Haley could trust defendant due to his MOB Piru gang membership—the equivalent of the expression, "Scout's honor." When defendant spoke to Bennett, he said, "I'm in the hood, Blood," meaning he was in his gang's territory. Defendant also said he was "outside Blood gang banging," which meant he was associating with the gang, standing outside wearing the gang's colors and "flashing" or "throwing" gang signs. Detective Sanchez explained that "180" was gang slang for Penal Code section 187 and thus meant murder.

In one recorded conversation, defendant told MOB Piru gang member "Whitey" that defendant was at a dealership to buy a car. In another, defendant spoke to Haley and told him defendant had "already seen that shit" and was going to get "get rid of" it that week. Defendant also spoke to "Keith," identifying him as a gang member by calling him "Blood." Defendant told Keith he was "too upside down" and had to "get rid of that mother fucker." Defendant asked whether Keith knew someone who could do it for him. In a conversation with his sister, Alexis Graves (Alexis), defendant told her he was going to come and stay with her because the police were harassing everybody. The next day, defendant called Bennett, told him it would be costly to get

9

rid of the "gray thing" and that defendant would buy the Impala as soon as he received his tax refund. Defendant also complained to Bennett someone was "running their mouth" to the police and said if anyone "goes down . . . everybody will eat their shit."

On April 26, 2008, defendant telephoned the L.A. Autoplex car dealership on Firestone Boulevard to inform "Joey" defendant would be there that day to buy the car they had discussed. That evening, defendant telephoned Tyree and Haley to tell them he had purchased the new car. Wiretap investigators notified LASD, and Detective Joe Espino recovered defendant's Mustang from the dealership.

### *Reactions to Bennett's arrest*

Detectives Brown, Sanchez, and Espino spoke to Bennett at his residence on May 7, 2008. Detective Brown told him they were investigating the murder of the young woman at the Ace Liquor Store, which was shown on the news, and asked him to come to the station for an interview. Although Bennett initially denied involvement, he agreed to go with them to the station. After the interview, Bennett was arrested.

Bennett's arrest resulted in a flurry of telephone calls. At 3:43 p.m. on the same day, defendant told his sister that Bennett had been taken to jail and he did not know why. Alexis looked on the Internet and found that Bennett was expected to be released that day. A few minutes later, defendant received a call from Miguel Brandon, who asked for "Mo's" real name. Defendant replied, "Maurice Bennett" and told Brandon that he had checked the Internet and could not find out why Bennett had been arrested.

A minute after the call from Brandon, defendant telephoned "E" and asked what had happened. E said Bennett

10

had been picked up by the homicide bureau and that his bail had been set at a million dollars, but E did not know whether the district attorney was trying to "bring that case back on him." Defendant replied, "It wasn't no homicide." Five minutes later, defendant called Brandon, gave him the spelling of Bennett's last name so that he could search for information, and told him to find Whitey.

Defendant then called Michael Washington, who was also known as Keith, and they discussed the arrest. Defendant repeated that Bennett had been arrested by the homicide division, and his bail had been set at $1 million; they agreed this meant that Bennett had been charged with murder. Washington then asked defendant, "Was Mo with ya'll?" When defendant asked, "When?" Washington said, "You know what I'm talking about." Defendant replied, "Uhhh . . . I think, yeah."

Washington then said that Haley had "said something." A moment later, defendant discovered that Phillipus had been arrested by DOJ, but he did not know on what charge. After more conversation about Bennett, Washington explained he had just been in the car with "Murder" and "that's why [he] was speaking in code." Washington had taken Murder to "get an estimate, on his shit, but yeah, that's crazy man! For that shit just to be happening like that. That's what I'm saying. But see . . . what I was thinking that they get license plates, but I doubt that because if they did they would've been came, you know what I mean?"

After another call from defendant's sister about Bennett's bail, defendant telephoned Tyree to tell her that "the police got Mo." Defendant said Mo's father had money for bail and that he did not believe the police had evidence to charge him. Later that

11

evening, someone named Brown called defendant and was told that "Mo is in jail." Brown asked, "For?" Defendant replied, "For the one eighty."

### Bennett's confession

Bennett's interview with the detectives was secretly recorded. The redacted recording was played for the jury.[3] Bennett told the detectives he had been in Maxwell's white Camaro at the time of the Ace Liquor Store shooting. Bennett had gone with Maxwell to the "Killen Quarters" cul-de-sac, where they met the other participants in the shooting. The Killen meeting place was their "hang out spot place." Someone handed Bennett the rifle, but he could not remember who.

They then went patrolling the Palm and Oaks neighborhood and targeted the men standing outside the liquor store because they were "more than likely" Palm and Oaks gang members. Bennett did not know the men. Only Bennett and Maxwell were in the white Camaro. Bennett was in the passenger seat when "the [redacted] car started shooting so [Bennett] just started shooting in the air" with the M-1 rifle and fired until the ammunition ran out. Bennett claimed he did not aim at anyone but just shot because "they were shooting."

---

[3] The recording was reviewed and redacted "per [defense counsel's] agreement and stipulation." Before it was played to the jury the trial court admonished them: "You may consider this evidence only against Mr. Bennett and not against Mr. Graves. In other words, do not consider Bennett's statements to investigators in assessing Graves's guilt. Also, certain irrelevant material is deleted and redacted from the interview by agreement of the parties, the attorneys. Do not speculate as to what the material might have been or why it was deemed irrelevant. Redacted just means removed."

Bennett explained the reason he fired the weapon was "if you be in a gang you want recognition for . . . doin' shit." Afterward, Bennett picked up his car and drove home. He left the rifle in the Camaro.

One of the participants in the liquor store shooting was Lindsey, nicknamed "Lizard." Bennett claimed that Phillipus was not there and did not participate in the shooting. When the detectives asked him to identify persons depicted in a photographic lineup, he refused, concerned that giving information to the police would show "on [his] paperwork" in jail, which "could be real bad." Bennett denied knowing about the shooting at the mechanic's shop on Rosecrans Avenue.

### Tyree interview and jailhouse recording

Detectives Brown and Espino interviewed Tyree at her place of employment and described the wiretapped calls for her. She told them she had seen the shooting video on the Internet, and she recognized defendant's car. When defendant learned about the interview, he was upset she had spoken to the detectives. In September 2008, after defendant's arrest, he called her from jail. Defendant said he could not understand why she would tell the police the truth, and they argued. Tyree explained, because the detectives showed her the evidence, she could not "deny it"; and if she withheld information, she would be an accessory.

### Gang evidence

Based upon his experience and the information collected by law enforcement, Detective Sanchez opined defendant, Bennett, and Maxwell were active members of the MOB Piru gang, a criminal street gang that claimed the northeast portion of Compton as its territory. Gang members "put in work" for their

13

gang by committing violent crimes, which serves to maintain and enhance their reputations within the gang. More violent crimes earned greater status for the member. The gang's primary activities consisted of murder, assault, possession and selling of firearms, robbery, burglary, narcotic sales, vandalism, and petty theft.

Gangs usually defended their territory with graffiti and by committing violent crimes against rivals inside and outside their territory. The MOB Piru gang's primary rival was the Palm and Oaks Crips gang, which claimed the area that encompassed the Ace Liquor Store. The store was known as a "hang out" for Palm and Oaks Crip gang members. In response to a hypothetical question based on the facts of this case, Deputy Sanchez opined that the crimes were committed for the benefit of the MOB Piru gang.

Defendant presented no evidence.

**Defendant's section 1172.6 petition**

In January 2019, defendant filed a petition for vacatur and resentencing under now-section 1172.6. Counsel was appointed. Despite the jury being instructed regarding natural and probable consequences, the trial court denied the petition on November 10, 2020, without issuing an order to show cause. On appeal, the parties agreed the denial should be reversed. Accordingly, this court reversed the trial court's order and remanded the matter for the issuance of an order to show cause and an evidentiary hearing pursuant to section 1172.6, subdivision (d).

On remand, the trial court issued an order to show cause. On October 6, 2023, the court held an evidentiary hearing at which defendant argued, and the court agreed, due to the intervening passage of Senate Bill No. 775 (2021–2022 Reg.

14

Sess.) (Senate Bill 775), he was eligible for resentencing on both his murder and attempted murder convictions. Relying on the evidence adduced at trial, the People argued defendant remains "guilty, beyond a reasonable doubt of murder and attempted murder as a direct aider and abettor with malice aforethought." Defendant argued there was no evidence establishing he knew what the shooter intended to do or he intended to aid the commission of the act. Instead, he argued, there was only evidence of his actions after the shooting.

After reviewing the trial record and entertaining the parties' arguments, the court denied defendant's petition. Specifically, the court pointed to defendant's role as "the driver of the gray automobile where shots were fired," the gang-related motive and evidence demonstrating it was a "planned attack," defendant's statement "that the shooter had bad aim," along with his other statements captured "through wiretaps acknowledging the crime, speaking to others about the crime, [and] never denying the crime or that he knew the crime was going to occur . . . ." Ultimately, the court found beyond a reasonable doubt, based on the evidence presented at trial, defendant was guilty of the crimes of murder and attempted murder as a direct aider and abettor.

Defendant timely filed his notice of appeal.

## DISCUSSION

I. **Applicable Law**

   A. ***Senate Bill No. 1437 and Senate Bill No. 775***

Effective 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of

murder (*People v. Reyes* (2023) 14 Cal.5th 981, 984) and narrowed the felony-murder rule (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Curiel* (2023) 15 Cal.5th 433, 448–449 (*Curiel*)).  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on one's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e).  The latter provision now requires the People to prove the defendant was the actual killer (§ 189, subd. (e)(1)); an aider and abettor to murder who had the intent to kill (§ 189, subd. (e)(2)); or a major participant in an underlying felony listed in section 189, subdivision (a), who acted with reckless indifference to human life as described in subdivision (d) of section 190.2 (§ 189, subd. (e)(3); see *Curiel*, at p. 448).

Senate Bill 775, effective January 1, 2022, subsequently clarified the amendments to sections 188 and 189 also applied to attempted murder convictions.  (*People v. Coley* (2022) 77 Cal.App.5th 539, 544 (*Coley*).)  As a result, under section 1172.6 "[a] person convicted of . . . attempted murder under the natural and probable consequences doctrine" may petition the superior court to vacate their conviction and be resentenced on any remaining counts if the petitioner could not now be convicted of attempted murder because of the changes to sections 188 and 189.  (§ 1172.6, subd. (a).)

"'Under section 1172.6, the process begins with the filing of a petition declaring that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189" made by Senate Bill 1437.  (§ 1172.6, subd. (a)(3).)  The trial court then reviews the petition to determine whether a prima facie showing has been made that the petitioner

16

is entitled to relief.  (*Id*., subd. (c).)'"  (*People v. Oyler* (2025) 17 Cal.5th 756, 836, as modified July 16, 2025.)  If the petition states a prima facie case for relief, the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the conviction.  (§ 1172.6, subds. (c), (d)(1).)  At that hearing, the prosecution has the burden to prove beyond a reasonable doubt that the defendant is guilty of murder or attempted murder under current law.  (§ 1172.6, subd. (d)(3).)  The prosecution therefore must prove that the defendant personally harbored an intent to kill.  (*People v. Das* (2023) 96 Cal.App.5th 954, 960.)  And if the prosecution contends the defendant is guilty as an aider and abettor, it must also prove that the defendant "'aid[ed] the commission of th[e] offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends."'"  (*Curiel, supra*, 15 Cal.5th at p. 463.)

**B.**     *Standard of review*

We review the trial court's denial of a section 1172.6 petition after an evidentiary hearing for substantial evidence.  (*People v. Reyes, supra*, 14 Cal.5th at p. 988.)  Under this standard, "'[w]e '"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."'  [Citation.]  Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any

17

substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.'" (*People v. Davis* (2024) 107 Cal.App.5th 500, 509.)

### C. *Aider and abettor versus natural and probable consequences*

An aider and abettor may be held criminally liable for the same crime as the direct perpetrator. (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*), superseded by statute on other grounds as stated in *People v. Oyler, supra*, 17 Cal.5th 756; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "Because aiders and abettors may be criminally liable for acts not their own, cases have described their liability as 'vicarious.'" (*McCoy*, at p. 1117.) However, their liability is "not entirely vicarious." (*Ibid*.) Their "guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*Ibid*.)

The Supreme Court has identified the three mental states and acts defining direct aiding and abetting as follows: "'(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.'" (*People v. Thompson* (2010) 49 Cal.4th 79, 117.)

On the other hand, "under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the 'natural and probable consequence' of

18

the crime the accomplice aided and abetted . . . ." (*Gentile, supra*, 10 Cal.5th at p. 843; see *People v. Hin* (2025) 17 Cal.5th 401, 441.) Culpability for the direct perpetrator's crime is therefore imputed to the accomplice based solely on the accomplice's participation in the separate target crime. (*Gentile*, at pp. 843–844.)

### D.     *Attempted murder and "kill zone" theory*

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal. 5th 591, 602.) With regard to attempted murder, however, there the Supreme Court has "expressly embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Ibid.*) This concurrent intent theory is referred to as the "kill zone." (*Id.* at p. 603.)

The kill zone theory is an express malice theory of culpability and a "theory for establishing the specific intent to kill required for conviction of attempted murder." (*People v. Canizales, supra*, 7 Cal.5th at p. 607.) Under the kill zone theory, "a defendant may be convicted of the attempted murder of an individual who was not the defendant's primary target." (*Id.* at p. 596.) "The kill zone theory permits a jury to infer a defendant's intent to kill an alleged attempted murder victim from circumstantial evidence (the circumstances of the

19

defendant's attack on a primary target)." (*Id.* at p. 597; see *People v. Mumin* (2023) 15 Cal.5th 176, 193 (*Mumin*) ["a kill zone is an area which a defendant intentionally creates in order to kill all those within it to ensure the primary target's death"].)

Thus, concurrent intent is simply a reasonable inference the jury or trier of fact may draw in a given case based on the circumstances of the attack. (*Mumin, supra*, 15 Cal.5th at p. 193.) To convict a defendant under the kill zone theory, the jury must find the "defendant intended to kill everyone in the kill zone as a means of killing the primary target." (*Canizales, supra*, 7 Cal.5th at pp. 607–608, fn. 5.) Accordingly, the kill zone theory does *not* dispose of the requirement that the jury find an intent to kill and instead allow the jury to impute malice.

## II.    Analysis

As discussed, Senate Bill 1437 and Senate Bill 775 eliminated the natural and probable consequences doctrine as it relates to attempted murder. (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 193 [Senate Bill 775 "clarified Senate Bill 1437 by amending section [1172.6] to make clear the natural and probable consequences doctrine no longer supplies accomplice liability to attempted murder"].) Thus, section 1172.6 "applies by its terms only to attempted murders based on the natural and probable consequences doctrine. (§ [1172.6], subd. (a) ['A person convicted of . . . attempted murder under the natural and probable consequences doctrine . . . may file a petition'].)" (*Coley, supra*, 77 Cal. App.5th at p. 548.)

Defendant's jury was instructed on both direct aiding and abetting and natural and probable consequences. As a result, defendant was entitled to an evidentiary hearing under section 1172.6, subdivision (d), at which the prosecution had to prove

20

defendant harbored intent to kill and is guilty of murder or attempted murder under the current law. The record demonstrates, during the hearing, the trial court weighed the evidence and found beyond a reasonable doubt defendant was a direct aider and abettor who had the intent to kill Ledford and Davis.

On appeal, defendant does not attack the trial court's finding he was a direct aider and abettor with the intent to kill. Defendant agrees the specific intent to kill Ledford and Davis supplied the requisite intent to kill Herrera under the transferred intent doctrine. He argues, instead, the attempted murder convictions in counts 2 and 5 (Avila and Martinez) should be vacated because the circumstances of the shooting "do not support the inference that the shooters specifically intended to kill everyone present," as required by the kill zone theory, and thus there was no intent to kill Avila and Martinez. Alternatively, defendant argues, "to the extent those factors . . . prove the requisite intent for *the shooters*, they do not support concluding that *Mr. Graves* harbored that same broad intent." We disagree.

### A. *Defendant was a direct aider and abettor*

Though defendant's jury was instructed on both natural and probable consequences and direct aiding and abetting, during closing arguments, the People focused on a theory of direct aiding and abetting. Specifically, the People said, "for [defendant] as to [the attempted murder counts] . . . you do need to go into whether or not he aided and abetted in the shooting of those four victims. [¶] And the reason why natural and probable consequences shouldn't even be applied to these two is the following. . . . [¶] So for [defendant] the question would be: did he aid and abet in the

21

murder of Kyutza Herrera; and did he aid and abet in the attempted murders of the four other victims?" The prosecutor then went through each required finding under aiding and abetting: did defendant know what the shooter intended to do, did defendant intend to aid the shooter before or during the crime, and did defendant's "words and conduct . . . , in fact, aid and abet the commission" of the offense.

Next, the prosecutor went through all the evidence pointing to defendant's role as a direct aider and abettor—defendant was a member of MOB Piru, he along with three other members went into rival gang territory to commit the shooting, defendant along with others committed three other shootings with the same modus operandi, the guns and one of the cars used in the shooting belonged to defendant, and the two cars used in the shooting caravanned in a "military-like" operation with defendant "leading the pack." She argued the "undisputed evidence clearly illustrate[d] beyond a reasonable doubt every element that you have to find in finding [defendant] guilty as an aider and abettor." During her rebuttal, the prosecutor again argued "[defendant] is guilty as an aider and abettor to all the charges because of the several things that he did."

At the conclusion of the evidentiary hearing, the trial court pointed to defendant's behavior before, during and after the offense in finding, beyond a reasonable doubt, defendant was guilty as a direct aider and abettor. The court found the evidence established defendant was the driver of the Mustang and his statement that the shooter had "bad aim" demonstrated his intent to kill alleged rival gang members, Ledford and Davis. Substantial evidence supports these findings. Moreover, there is evidence the guns used in the attack belonged to and were

supplied by defendant.  This, along with the level of coordination involved where two cars were used in tandem to complete the shooting, provides further support for the court's ruling.

**B.** ***Defendant had concurrent intent to kill Avila and Martinez***

As discussed, defendant does not dispute he harbored specific intent to kill Ledford and Davis.  Instead, he argues the evidence of concurrent intent to kill Avila and Martinez is insufficient.

During trial, the theory of guilt for the attempted murder of Avila and Martinez was concurrent intent to kill everyone in the zone around the primary targets, Ledford and Davis—the kill zone theory.  The prosecutor argued the evidence demonstrated the shooters had the intent to kill Ledford and Davis and created a kill zone around them based on the number rounds fired, placement of the bullets, and the coordinated "military-like operation."

The kill zone instruction given to defendant's jury provided: "A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.'  [¶]  In order to convict the defendant of the attempted murder of Carols Avila, Count 2, or Marcello Martinez, Count 5, or both, the People must prove that the defendant not only intended to kill Timthy Ledford, Count 3, or Ronald Davis, Count 5 or both, but also either intended to kill Carlos Avila and/or Marcello Martinez, or intended to kill anyone within the kill zone.  [¶]  If you have a reasonable doubt whether the defendant intended to kill Avila or Martinez or intended to kill Ledford or Davis by killing everyone in the kill zone, then you

23

must find the defendant not guilty of the attempted murder of Avila or Martinez." (Former CALCIM No. 600.)

In this regard, the jury was not instructed it need not find defendant harbored malice toward a particular victim. On the contrary, the kill zone instruction provided the jury could only find defendant guilty of attempted murder if it found either he had the specific intent to kill Martinez and Avila as the primary targets, or he intended to kill Martinez and Avila because they were in the kill zone created around the primary targets (Ledford and Davis).

At the hearing on defendant's petition, the trial court found beyond a reasonable doubt defendant was a direct aider and abettor with the intent to kill all of the victims. Nothing in the use of a concurrent intent theory of liability changes the requirement that defendant harbor malice and an intent to kill. We find substantial evidence supports the trial court's ruling.

To the extent defendant challenges whether the jury should have been instructed on the kill zone or the validity of kill zone instruction given in his case, any perceived error "has nothing to do with the 2018 and 2021 legislative changes that gave rise to section 1172.6's petition process."[4] (*People v. Burns* (2023) 95 Cal.App.5th 862, 865; see also *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 936–937.) Neither Senate Bill 1437 nor

---

[4]     Defendant may raise any claim of instructional error under *Canizales* in a petition for writ of habeas corpus. (See *In re Sambrano* (2022) 79 Cal.App.5th 724, 731–732, disapproved on other grounds in *Mumin, supra*, 15 Cal.5th at p. 209, fn. 11 [considering habeas petition seeking reversal of attempted murder convictions due to erroneous kill zone instruction].) We express no opinion on the merits of such a petition.

Senate Bill 775 made changes to the law to limit liability for attempted murder on a concurrent intent theory.  Therefore, defendant has not established he "could not presently be convicted of murder or attempted murder *because of changes* to Section 188 or 189" as a result of Senate Bill 1437 and Senate Bill 775.  (§ 1172.6, subd. (a)(3), italics added.)

We conclude substantial evidence supports the trial court's finding defendant is guilty as a direct aider and abettor, and, consequently, the court properly denied his petition for resentencing under section 1172.6.

## DISPOSITION

The order denying the section 1172.6 petition is affirmed.


CHAVEZ, J.


We concur:


LUI, P. J.


GOORVITCH, J.*


---

\*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25